THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SAYAD AYAR,<br><br>                       Plaintiff,<br><br>        v.<br><br>LIBERTY NORTHWEST INSURANCE CORPORATION,<br><br>                       Defendant. | CASE NO. C10-1788-JCC<br><br>ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

This matter comes before the Court on Defendant's motion for summary judgment (Dkt. No. 21). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS in part and DENIES in part the motion for the reasons explained herein.

I.      BACKGROUND

Plaintiff Sayad Ayar purchased and maintained a $1,500,000.00 insurance policy from Liberty Northwest Insurance Corporation ("LNW") for his home in Des Moines, Washington. The policy covered physical damage caused by windstorms, among other perils. It also contained various exclusions, including an exclusion for losses caused by "faulty, inadequate, or defective" construction. (Dkt. No. 22 at 57.)

On October 6, 2008, Ayar contacted LNW to report a claim for loss as a result of water leaking from the ceiling in his living room. At the time, Ayar's house was less than three years

old.

On October 21, 2008, LNW hired an engineering firm, CASE Forensics, to investigate the source of the water damage in order to determine if the loss was covered by the policy. (Dkt. No. 22 at 8-10.) CASE inspected the residence, interviewed the architect who had designed the house, photographed the damage, took moisture readings, conducted non-invasive examination of concealed spaces with an imaging camera, and conducted an engineering analysis of the findings. (Dkt. No. 22 at 9-16.) CASE also interviewed Ayar about the history of the loss and noted that Ayar had been the general contractor during the construction of the house from 2005-2006. (*Id.*)

CASE's report ultimately concluded that the loss was the result of construction defects, specifically "the failure to install an adequate and continuous waterproof membrane, flashing, and drainage system within the balcony at the time of construction." (Dkt. No. 22 at 17.) On December 2, 2008, LNW issued a denial of coverage letter to Ayar, stating that coverage did not apply to the loss as the damages were "solely the result of construction defects" and were subject to a policy exclusion. (Dkt. No. 22 at 56.)

Subsequently, Ayar hired his own engineer—Edward C. Robinson, P.E., S.E.—who concluded on the basis of a visual examination that the water leakage was the result of damage done to the weather deck waterproofing during a storm event with high winds. (Dkt. No. 22-1 at 2-3.) This type of loss would be covered under the policy.

LNW then commissioned a supplemental report from CASE in order to assess Robinson's findings. CASE prepared a 7-page report analyzing Robinson's opinions, ultimately concluding that those opinions were unsupported by the observed evidence. (Dkt. No. 22-1 at 5-11.) LNW provided this report to Ayar in support of its decision not to change its coverage opinion.

In late February of 2009, Ayar reported to LNW that a "wind event" 1.5 years ago had caused cracks in his ceiling. It was unclear whether the claimed loss was the same as the

1   previously reported ceiling cracks due to water damage. LNW again retained CASE to determine

2   the cause and origin of the loss, and CASE prepared a comprehensive report. (Dkt. No. 22-1 at

3   13-23.) On September 18, 2009, CASE issued its report, which concluded that the ceiling cracks

4   were the result of structural movement of the dome assembly caused by environmental

5   conditions (temperature and humidity), which were exacerbated by certain construction defects.

6   (Dkt. No. 22-1 at 22-23.) LNW again denied coverage.

7         In November 2009, Ayar reported another leak in his ceiling, which he claimed was not

8   related to the leak he had reported in 2008. LNW retained American Leak Detection ("ALD") to

9   investigate the cause of the water intrusion. In a report dated December 22, 2009, ALD

10  determined that the water was intruding through voids at the door threshold at the transition

11  between the wall stucco and the threshold. (Dkt. No. 22-1 at 48.) ALD also concluded that the

12  way in which the stucco trim was installed had prevented the water intrusion into the stucco wall

13  from escaping. (*Id.*)

14        During the course of LNW's inspection of the claim, LNW authorized Ayar to cut into

15  the ceiling's drywall in order to assist in determining the source of the water intrusion, though it

16  also noted that coverage had still not been determined. (Dkt. No. 27 at 32.) Removal of the

17  drywall resulted in a hole in the ceiling, and Plaintiff decided to relocate his family to a rental

18  home until the drywall could be replaced. (Dkt. No. 26 at 5.) Ayar requested that LNW cover the

19  cost of his rental home as well as certain other costs. (*Id.*)

20        On January 25, 2010, LNW's claims adjuster provided a detailed analysis of the claim

21  and concluded that no coverage was available but recommended paying for the cost to reinstall

22  drywall and repair the hole in the ceiling (a total of $19,648.68), noting as follows:

> The reason I feel we may want to look at covering these damages [is] because the drywall needed to be removed so we could inspect for long term damages and it helped us to determine the exact cause and what type of damage we were looking at. Also, a leak detection was never run on the original claim and if it had been we may have been able to prevent further damage by advising the insured that the water was also entering through the door/stucco transition.

ORDER ON DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT
PAGE - 3

> I do not feel we owe for any of the long term damages, nor do I feel we owe for the damages to the patio or doors because this is a cause due to both wear and tear and construction defect.

(Dkt. No. 27 at 42.)

On February 16, 2010, LNW issued a letter denying Ayar's November 2009 claim, stating that "[o]ur investigation revealed your loss was caused by faulty and inadequate construction as well as wear and tear. This condition has allowed water to seep into the home under the patio doors and around the windows during inclement weather." (Dkt. No. 22-1 at 51.) LNW paid a total of $2,000.00 to Ayar to cover the cost of cutting into the ceiling as part of the investigation but refused to pay for replacement of the materials in the ceiling, noting that Ayar had removed the entire ceiling and that this was "excessive removal for the investigation." (Dkt. No. 22-1 at 52.) LNW also denied reimbursement for Ayar's additional living expenses, on the basis that his home had been livable and because his loss was not covered. (*Id.*)

In August 2010, Ayar brought this suit, alleging that LNW's conduct during the investigation of his claims violated the Washington Administrative Code ("WAC") as well as the Washington Consumer Protection Act ("WCPA"). In November 2010, LNW removed the case to federal court on the basis of diversity jurisdiction. LNW now moves for summary judgment.

## II.     DISCUSSION

### A.     Summary Judgment Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." An issue of fact is genuine if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in the nonmovant's favor. *Id.* at 255.

ORDER ON DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT
PAGE - 4

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the non-moving party's case. *Id*. at 325. If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. *Anderson*, 477 U.S. at 250.

### B.  Bad Faith and Washington Consumer Protection Act Claims

Ayar asserts two claims: (1) breach of the Washington Consumer Protection Act ("CPA") and (2) bad faith (as demonstrated by breaches of the Washington Administrative Code). (*See* Dkt. No. 26 at 14.)

"The duty to act in good faith or liability for acting in bad faith generally refers to the same obligation." *Tank v. State Farm Fire & Cas. Co.*, 715 P.2d 1133, 1136 (Wash. 1986). "[R]egardless of whether a good faith duty in the realm of insurance is cast in the affirmative or the negative, the source of the duty is the same. That source is the fiduciary relationship existing between the insurer and insured." *Id*. The duty of good faith is both legislatively and judicially imposed. *See* RCW 48.01.030; *Tank*, 715 P.2d 1133 at 1136. "[A]n insurance company's duty of good faith rises to an even higher level than that of honesty and lawfulness of purpose toward its policyholders: an insurer must deal fairly with an insured, giving equal consideration *in all matters* to the insured's interests." *Tank*, 715 P.2d 1133 at 1136 (emphasis in original). However, "[a]s long as the insurance company acts with honesty, bases its decision on adequate information, and does not overemphasize its own interests, an insured is not entitled to base a bad faith or CPA claim against its insurer on the basis of a good faith mistake." *Coventry v. American States Ins. Co.*, 961 P.2d 933, 938 (Wash. 1998). The determinative question is "the reasonableness of the insurer's actions in light of all the facts and circumstances of the case."

1  *Industrial Indem. Co. of the Northwest, Inc. v. Kallevig*, 792 P.2d 520, 528 (Wash. 1990).

2  Pursuant to authority under RCW 48.01.030, the Washington Insurance Commissioner
3  has promulgated regulations that define specific acts and practices that constitute a breach of an
4  insurer's duty of good faith. *See* WAC 284-30-300 *et seq.*; *Tank*, 715 P.2d at 1136. Generally,
5  "[a]n action for bad faith handling of an insurance claim sounds in tort." *Safeco Ins. Co. of*
6  *America v. Butler*, 823 P.2d 499, 503 (Wash. 1992). However, a breach of these regulations also
7  constitutes a per se unfair trade practice violation, and an insured may use such a breach as the
8  basis of a CPA claim against his or her insurer. *Tank*, 715 P.2d at 1140.

9  To prevail on a CPA claim, one must show 1) an unfair or deceptive act or practice, (2) in
10 trade or commerce, (3) that impacts the public interest, (4) which causes injury to the party in his
11 business or property, and (5) which injury is causally linked to the unfair or deceptive act.
12 *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533 (Wash. 1986).
13 The insured may establish the first element by showing a violation of any subsection of WAC
14 284-30-330. *See Indus. Indem.*, 792 P.2d at 528-29.

15 "The tort of bad faith has been defined as a breach of the obligation to deal fairly with an
16 insured, giving equal consideration to the insured's interests." *Anderson v. State Farm Mutual*
17 *Ins. Co.*, 2 P.3d 1029, 1033 (Wash. Ct. App. 2000). The violation of a WAC 284-30-330
18 subsection establishes a breach of an insurer's obligation to deal fairly with an insured. *American*
19 *Manufacturers Mut. Ins. Co. v. Osborn*, 17 P.3d 1229, 1234 (Wash. Ct. App. 2001). However,
20 unlike the injury in a valid CPA claim, which must be an injury to "business or property," the
21 injury alleged for a bad faith claim may include emotional distress or personal injury. *Id.*; *see*
22 *also Anderson*, 2 P.3d at 1035.

23 In this case, Ayar does not allege that LNW erred in determining that coverage does not
24 exist. (*See* Dkt. No. 26 at 15 (indicating that Plaintiffs' claims are all extra-contractual).)
25 Nevertheless, "an insured may maintain an action against its insurer for bad faith investigation of
26 the insured's claim and violation of the CPA regardless of whether the insurer was ultimately

ORDER ON DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT
PAGE - 6

correct in determining coverage did not exist." *Coventry*, 961 P.2d at 937. This is so because "[a]n insurer's duty of good faith is separate from its duty to indemnify if coverage exists." *Id*.

In order to prevail on its summary judgment motion with respect to Ayar's CPA and bad faith claims, LNW must show that there is no material question of fact as to (1) whether it violated any of the subsections of WAC 284-30-330 identified by Plaintiff; or (2) whether such violation caused a recognized injury.

### C. Alleged Violations of Washington Insurance Regulations

The first main issue before the Court is whether LNW has shown that no material question of fact exists with respect to whether it violated any of the three subsections of WAC 284-30-330 that Ayar cites.

#### i. Misrepresenting pertinent facts or insurance policy provisions

The first subsection cited by Ayar in support of his claims is WAC 284-30-330(1), which provides that "misrepresenting pertinent facts or insurance policy provisions" is an unfair claims settlement practice. *See also* WAC 284-30-350 (requiring an insurer to fully disclose "all pertinent benefits, coverages or other provisions of an insurance policy or insurance contract under which a claim is presented"). Ayar claims that LNW misrepresented the policy in four ways.

First, Ayar asserts that LNW misrepresented the facts or policy by including language in the first denial letter that referenced the policy exclusion for loss caused by water damage from— inter alia—floods, water which backs up through sewers, or water below the surface of the ground. (*See* Dkt. No. 26 at 9-10.) The Court does not agree. Even if the provision was not directly applicable, LNW's reference to policy language pertaining to water damage in a case where Ayar had made a water damage claim can hardly be considered a misrepresentation. (*See* Dkt. No. 22 at 47.) LNW did not rely on this provision as the reason for denying coverage, and Ayar has not submitted any evidence supporting the claim that he was harmed by this purported misrepresentation.

ORDER ON DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT
PAGE - 7

1    Second, Ayar contends that LNW misrepresented the policy by referencing "fungi, wet or dry rot" in the third denial letter. This is not a misrepresentation since it is to be expected that a water damage claim may involve mold damage and wet rot. Mold damage was later confirmed by Ayar upon removal of the drywall. (Dkt. No. 22 at 42.) And, again, Ayar does not submit any evidence that he was harmed by this alleged misrepresentation.

Third, Ayar claims that LNW misinterpreted the policy by including the policy exclusion for loss resulting from defective construction in the denial letters. Here, too, Ayar does not allege any related harm. Furthermore, LNW's inclusion of this policy language was clearly appropriate given that the construction defect exclusion was the principal basis for denying the claim.

Fourth, Ayar argues that LNW misrepresented facts regarding the drywall removal because it "encouraged Plaintiff to remove drywall from the ceiling in order to investigate the damage even though it had "full knowledge" that the claim would be denied. (Dkt. No. 26 at 11.) Ayar asserts that the adjuster should have informed him that LNW would not pay for the drywall repairs if there was no coverage. (*Id*.) Here, in contrast to the three purported misrepresentations discussed above, the Court finds that a triable issue of fact exists. A reasonable jury could find that LNW misrepresented pertinent facts in this instance; indeed, LNW's own claim files indicate that its adjuster recommended that payment be made to repair the drywall after noting that Ayar had relied upon the adjuster's instructions to take down the drywall. (Dkt. No. 27 at 42.)

ii.   **Refusal to Pay Claims Without Conducting a Reasonable Investigation**

The second subsection cited by Ayar in support of his claims is WAC 284-30-330(4), which prohibits an insurer from denying an insured's claim without conducting a reasonable investigation. Ayar claims that LNW acted unreasonably by failing to conduct a comprehensive leak investigation to determine the origin of the leak. (Dkt. No. 26 at 12.) LNW, on the other hand, contends that it complied with its good faith investigation obligation by hiring a reputable

ORDER ON DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT
PAGE - 8

engineering firm to investigate the claim. (Dkt. No. 28 at 3.) LNW further claims that its good faith duty did not require it to ensure that its investigators identify the location of each and every construction defect resulting in the water intrusion. (*Id.*)

Ayar's claim that LNW's investigation was unreasonable is unsupported by the law or the facts. First of all, Ayar does not cite any authority in support of its position that an insurer is required to definitively determine the source of a water leak. Rather, he merely states that the necessity of a leak investigation is "obvious based upon the nature of Plaintiff's claim." (Dkt. No. 26 at 12.) However, LNW's duty was to conduct a "good faith investigation" into the claim before determining whether coverage was available, and the evidence before the Court indicates that LNW did precisely that.

This is not a case where the insurer failed to investigate or did so only half-heartedly, instead basing its coverage decision on mere "suspicion and conjecture." *See Aecon Bldgs., Inc. v. Zurich N. Am.*, 572 F. Supp. 2d 1227, 1236 (W.D. Wash. 2008). Following Ayar's report of the loss, LNW inspected the premises and then hired a reputable engineering firm, CASE Forensics, to conduct further investigation. (Dkt. No. 22 at 8.) The initial report compiled by CASE is detailed and well-reasoned. Subsequently, after Plaintiff hired an expert who made different findings, LNW commissioned a supplemental report from CASE, which is similarly comprehensive.

While the continued leakage problem suggests that CASE's report may not have identified all the construction defects that contributed to the leakage problem, this in and of itself is not proof that LNW's investigation was unreasonable. Notably, the expert Plaintiff retained also failed to identify the definitive source, or all the sources, of the leakage problem; indeed, Plaintiff testified in his deposition that the expert he hired was "totally" wrong about the cause of the leakage problem. (*See* Dkt. No. 22 at 51.) Furthermore, while Plaintiff suggests that a reasonable inspection would have included some disassembly or other more intrusive mechanisms, going beyond a mere visual inspection (*see* Dkt. No. 26 at 12), Plaintiff submits no

evidence that not doing so was unreasonable. For example, Plaintiff submits no evidence and does not allege that LNW's investigation was unusually limited in scope in comparison to what is typical in the industry or that the engineering firm hired by LNW was anything other than reputable.

In light of the facts and circumstances, the Court finds that the available evidence indicates that LNW conducted a reasonable investigation into Ayar's claims and that no genuine issue of fact remains for trial with respect to Ayar's claim that LNW violated WAC 284-30-330(4).

### iii.  Failure to Promptly Investigate the Claim

The third subsection Ayar relies upon is WAC 284-30-330(3), which requires an insurer to promptly investigate the claims of an insured. A related provision describes the standard for a prompt investigation as follows:

> Every insurer must complete its investigation of a claim within thirty days after notification of [the] claim, unless the investigation cannot reasonably be completed within that time. All persons involved in the investigation of a claim must provide reasonable assistance to the insurer in order to facilitate compliance with this provision.

WAC 284-30-370.

Ayar alleges that LNW failed to promptly investigate because LNW failed to complete its investigation of his claims within the required thirty-day period. Specifically, with respect to his October 2008 claim, Ayar alleges that it took over a month for the investigator to provide a report and almost four months for LNW to deny the claim. (Dkt. No. 26 at 12.) With respect to his November 2009 claim, Ayar contends that LNW was responsible for a series of delays, including by waiting over 43 days after notification to send an investigator to his home. (Dkt. No. 26 at 12.) LNW, however, insists that the delays in the investigation were reasonable due to the nature of Ayar's claim and on account of Ayar's own obstructive behavior and failure to cooperate with LNW's investigation. (*See* Dkt. No. 28 at 4.)

ORDER ON DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT
PAGE - 10

Both parties have submitted evidence in support of their claims. Viewing the evidence in the light most favorable to Ayar, the Court finds that a reasonable jury could find in favor of Ayar on this claim. Thus, there is a triable issue of fact with respect to whether LNW violated WAC 284-30-330(3).

### D.     Alleged Harm

The second main issue before the Court is whether there is an issue of fact as to whether LNW's purported violations of the insurance regulations caused a recognized injury. "To maintain a cause of action based on an insurer's bad faith or CPA violation the insured must establish [he or she] was harmed." *Coventry*, 961 P.2d at 938.

Construing Ayar's response liberally, he purports to allege three kinds of harm. First, he alleges that LNW's failure to conduct a leak investigation after his first claim resulted in a continued leak that caused his ceiling and much of his home to suffer structural damage that requires repair. (Dkt. No. 26 at 14.) Second, he appears to allege that LNW's unreasonable delay in investigating the claims resulted in harm since the water damage was progressive. (*Id.*) Third, he alleges that he suffered financial and property damage as a result of "misrepresentations regarding drywall repairs." (*Id.*) Specifically, Ayar claims that he was harmed because he relied upon the adjuster's instructions to take down the drywall but then was left with a huge hole in his ceiling and no assistance from the "very insurer who told him to create the hole by removing the drywall." (Dkt. No. 26 at 11.)

Ayar's first theory of harm is not relevant since, as discussed above, the Court has found that the evidence does not support a finding that LNW's investigation was unreasonable. In any case, both Ayar's first and second theory of harm are untenable since the evidence indicates that the water damage was caused by a peril that Ayar did not insure against—i.e., construction defects and wear and tear—and <u>not</u> by (1) an act or event that was a covered peril under the policy or (2) by any acts or omissions on the part of LNW.

Ayar's third theory of damage, however, is colorable. This theory is viable because LNW

authorized Plaintiff to remove the drywall in his ceiling without informing him that LNW would not pay for the drywall repairs if there was no coverage. If the jury were to find this to be a violation of WAC 284-30-330(1), the jury would also have a basis for determining that Ayar was harmed by this conduct and is entitled to recovery of the related damages.

### III. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Dkt. No. 21) is GRANTED in part and DENIED in part. In accordance with the above discussion, Plaintiff's bad faith and CPA claims are DISMISSED, EXCEPT TO THE EXTENT that they rely on Defendant's alleged misrepresentation of pertinent facts regarding the removal of drywall in violation of WAC 284-30-330(1).

DATED this 1st day of August 2012.

_____
John C. Coughenour
UNITED STATES DISTRICT JUDGE